**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>- against -<br><br>REAL PROPERTY LOCATED AT 1 CENTRAL PARK WEST, UNIT 32G, NEW YORK, NEW YORK 10023,<br><br>                    Defendant. | No. 24-cv-2420 (KPF)<br><br>*Related case*:  No. 19-mc-195 (KPF) |

## CLAIMANT ECREE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

PRYOR CASHMAN LLP
7 Times Square, Suite Level 40
New York, NY 10036
Tel: (212) 421-4100

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................1

BACKGROUND .............................................................................................................2

    *A.*   *Procedural background* ........................................................................2

    *B.*   *The Amended Complaint* ......................................................................4

        1.   The Government's Forfeiture Claims .............................................4

        2.   The Government's Factual Allegations ...........................................5

PLEADING STANDARDS................................................................................................9

ARGUMENT ..................................................................................................................10

    I.   The Amended Complaint fails to properly plead the Specified Unlawful
        Activities that are the basis for all the forfeiture claims ...............................10

        *A.*   *The Amended Complaint fails to allege that the Initial Transfer
            involved the misappropriation, theft or unlawful taking of funds of the
            Congolese government* ........................................................................10

        *B.*   *The government's suggestion that funds were "diverted" from the
            Congolese government after the Initial Transfer relies on a simple misuse
            of the term "diversion," rather than factual allegations supporting an
            inference that either SUA occurred* ........................................................11

        *C.*   *The Amended Complaint fails to allege that any Congolese government official
            "used the power of their ranks for corruption" or otherwise violated the
            Congolese law that is the basis for the Specified Unlawful Activities* .....................14

    II.   The Amended Complaint also fails to plead a violation of 18 U.S.C. § 2314
         because no basis for scienter is alleged.........................................................20

    III.   The Amended Complaint fails to allege that the Funds used to purchase the
          Apartment are traceable to the Initial Transfer ............................................20

CONCLUSION................................................................................................................23

i

## TABLE OF AUTHORITIES

**PAGE(s)**

### CASES

*Kades v. Organic Inc.*,
    2003 WL 470331 (S.D.N.Y. Feb. 24, 2003)..........................................................................20

*United States v. $1,399,313.74 in U.S. Currency*,
    591 F. Supp. 2d 365 (S.D.N.Y. 2008)...............................................................................9, 10

*United States v. $1,399,313.74 in U.S. Currency*,
    592 F. Supp. 2d 495 (S.D.N.Y. 2008)...................................................................................19

*United States v. $32,507.00 in U.S. Currency*,
    2014 WL 4626005 (S.D.N.Y. Sept. 16, 2014)........................................................................9

*United States v. One Gulfstream G-V Jet Aircraft*,
    941 F. Supp. 2d 1 (D.D.C. 2013) ..................................................................................18, 19

### STATUTES

18 U.S.C. § 981.................................................................................................................4, 21, 22

18 U.S.C. § 983.............................................................................................................................3

18 U.S.C. § 1956...................................................................................................................4, 5, 6

18 U.S.C. § 2314..............................................................................................................4, 5, 6, 20

## PRELIMINARY STATEMENT

Cribbing its factual allegations largely from a private report sent to Congress on April 10, 2019, the government seeks to forfeit Claimant Ecree's Apartment by accusing a Congolese public official of illegally diverting Congolese funds to purchase that Apartment, despite conceding that this public official did not purchase, or even live in, the Apartment.  But the Amended Complaint is devoid of key details about the source and tracing of the funds allegedly used to purchase the Apartment, and, more critically, fails to allege that any step in the flow of funds constituted illegal conduct under the anticorruption Congolese law that is the basis for the government's claims. Despite Claimant Ecree's pre-motion letter identifying these failures in the Original Complaint, the Amended Complaint through which the government sought to address these failures still fails to plausibly state a claim for forfeiture, and the Court should dismiss it in its entirety.

The Amended Complaint's theory of forfeiture requires it to plead facts supporting a reasonable inference that the funds used to purchase the Apartment are traceable to a Congolese official's illegal misappropriation of Congolese public funds.  Not only does the Amended Complaint fail to allege that any of the funds it describes originate from the Congolese state, but the government has furthermore conceded that it has not pleaded that the initial transfer to nonparty Asperbras of purportedly Congolese funds was illegal under Congolese law.  Because any public funds at issue in the Amended Complaint were lawfully obtained by the private company that received them, the government's entire theory founders at the start.

Having foreclosed for itself the argument that the transfer of public funds was illegal, the government changes tack and contends that the funds used to purchase the Apartment were illegally "diverted" from the initial transfer to Asperbras.  This argument makes little sense—the government has conceded that Asperbras obtained the entire initial transfer lawfully, and so once it did, the funds were no longer Congolese state funds subject to its anticorruption laws.  The

Amended Complaint also does not allege that funds were later diverted from Asperbras itself, nor that it would have been illegal under Congolese law if they had been. And even if the government is now inclined to take back its concession and contend for the first time that a Congolese public official intended for the funds transferred to Asperbras to be used to purchase the Apartment, or that some Congolese public officials involved in the transfer used their authority to orchestrate any of the conduct that it alleges, the Amended Complaint does not plead that this happened, much less allege specific facts supporting an inference that this happened.

Moreover, the Congolese laws relied upon by the Amended Complaint only apply to Congolese government officials, but the Amended Complaint does not plausibly allege that Claudia Sassou Nguesso was a Congolese public official at the time of the conduct it describes. It furthermore does not allege conduct by her or any of the other Congolese individuals described in the Amended Complaint that could constitute their "using their power of their ranks for corruption" as required by Congolese anticorruption law.

Setting aside all the above failures, however, even if the Amended Complaint plausibly alleged that some aspect of the initial transfer of funds had been diverted to purchase the Apartment, and even if had alleged that this was done illegally, the Amended Complaint fails to plausibly allege that the Apartment was actually purchased with any of these funds. The government's patch to the massive gap in the original complaint's recitation of the flow of funds still has a hole, and that failure also sinks the Amended Complaint.

## **BACKGROUND**

### A.     *Procedural background*

On March 29, 2024, the government commenced this action by filing a complaint for forfeiture *in rem* against Unit 32G at 1 Central Park West ("Apartment"). (ECF No. 1 ("Original Complaint" or "OC") ¶¶ 3-4.) The government notified Ecree LLC ("Ecree") of this action via

email on April 10, 2024.  Pursuant to 18 U.S.C. § 983 and Rule G(5)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Ecree filed its claim on May 14, 2024 as the owner of the Apartment.  (ECF No. 14.)

On June 3, 2024, in lieu of an answer, Ecree submitted a letter requesting a pre-motion hearing on a motion to dismiss the Original Complaint based on its failure to plead that the EUR 491 million on which the forfeiture claims were based were derived from a violation of Congolese law and its failure to allege that the funds used to purchase the Apartment are traceable to that EUR 491 million.  (ECF No. 19 ("Ecree MTD Letter").)  The government responded by letter on June 5, 2024.  (ECF No. 20 ("Gov. MTD Letter").)  In that letter, the government conceded that "Ecree has correctly identified a gap" in the Original Complaint's allegations concerning whether the funds used to purchase the Apartment are traceable to the EUR 491 million transfer, but asserted that it would fix that gap in an Amended Complaint.  (*Id*. at 2.)  The government also conceded that Ecree "is correct that the [Original] Complaint does not allege that the 491 million Euros paid to Asperbras by the Congolese state were procured through a violation of Congolese law," but argued that it was sufficient to allege that these funds were later "diverted."  (*Id*.)

On June 12, 2024, the Court held a conference concerning Ecree's anticipated motion to dismiss, as well as its stay of *Commissions Import Export S.A. v. Republic of the Congo et al.*, No. 19-mc-195 ("*Commissions Import Export*"), a related case pending before this Court that is stayed pending the outcome of this action (ECF No. 18).[1]  As agreed to by the parties during the hearing, the Court ordered that the government had until July 12, 2024 to file an amended complaint, and

---

[1]    As requested by the Court, Ecree obtained a transcript of the June 12 hearing, and it attached hereto as Exhibit A ("Tr.").

established a briefing schedule for this motion to dismiss.  (Tr. 10:23-12:7.)  The government

timely filed an amended complaint.  (ECF No. 22 ("Amended Complaint" or "AC").) [2]

    B.    *The Amended Complaint*

        1.    <u>The Government's Forfeiture Claims</u>

The Amended Complaint alleges that the Apartment is subject to forfeiture under 18

U.S.C. § 981(a)(1)(C) (Claim 1) and § 981(a)(1)(A) (Claims 2-5).

Section 981(a)(1)(C) states that real property, such as the Apartment, is subject to forfeiture

if it "constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting

'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18]), or a conspiracy to

commit such offense."  The government alleges that the Apartment is derived from the $7.1 million

("Funds") used to purchase the Apartment, and that these Funds are traceable to violations of two

specified unlawful activities: "misappropriation, theft, or embezzlement of public funds by or for

the benefit of a public official," 18 U.S.C. § 1956(c)(7)(B)(iv), and international transmittal of

money by someone "knowing the same to have been stolen, converted or taken by fraud," 18

U.S.C. § 2314 (together, the "Specified Unlawful Activities" or "SUAs").  The Amended

Complaint identifies Congolese law as the basis for determining whether the transactions to which

the Funds are traceable constitute "misappropriation, theft, or embezzlement" and whether they

involved transmittals of money by a person knowing the money to have been "stolen, converted

or taken by fraud."  (AC ¶¶ 31-33.)

---

[2]      On April 5, 2024, the Board of Managers of Trump International Hotel & Tower Condominium ("Condo Board") also filed a claim to the Apartment.  (ECF No. 5.)  The Condo Board has not filed an answer in this case, nor did counsel for the Condo Board attend the June 12, 2024 pre-motion conference.  The plaintiffs in *Commissions Import Export* also filed a claim (ECF No. 11), which they voluntarily dismissed on May 29, 2023 (ECF No. 16).

Section 981(a)(1)(A), which is the basis for Claims 2-5, states that real property, such as the Apartment, is subject to forfeiture if it is traceable to a transaction in violation of Sections 1956, 1957 or 1960. Count 2 alleges that the Apartment is traceable to a transmission in violation of Section 1957, because it is traceable to transmissions of a value greater than $10,000 derived from the same two SUAs discussed in the preceding paragraph: 18 U.S.C. §§ 1956(c)(7)(B)(iv) and 2314. Claim 3 alleges the Apartment is traceable to a transmission in violation of Section 1956(a)(1)(B)(i), which prohibits transactions "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," namely proceeds of the same two SUAs. Claim 4 alleges the Apartment is traceable to a transmission in violation of Section 1956(a)(2)(B)(i), which prohibits international transmissions to or from the United States by someone "knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part— (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," in this case the same two SUAs. Claim 5 alleges the Apartment is traceable to a conspiracy to commit the violations of Sections 1956 and 1957 alleged as the bases for Claims 2-4, in violation of Section 1956(h).

### 2.    The Government's Factual Allegations

As the factual basis for these five forfeiture claims, the Amended Complaint begins with a EUR 491 million November 8, 2013 invoice from Asperbras LLC ("Asperbras"), a Delaware limited liability company, "to the Congolese Délégation Générale des Grands Travaux (abbreviated 'DGGT')," a subpart of the Ministry of Territorial Planning and General Delegation of Major Works, a public Congolese agency. (AC ¶ 14.) The Amended Complaint alleges that this invoice was "partial payment for the construction of approximately 12 hospitals in Congo."

(*Id.*)  It does not describe the circumstances giving rise to the invoice, such as a contractual arrangement between Asperbras and the Congo, nor does it allege that the hospitals were not built in accordance with the terms of any such arrangement.  On November 28, 2013, "a Portugal-based bank account held by Asperbras at the now defunct Banco Espirito Santo ('BES') received a wire transfer in the amount of approximately EUR 491 million" ("Initial Transfer").  (*Id.*)  The Amended Complaint does not identify the transferor of the Initial Transfer or the source of the funds in that transfer, but alleges that the wire transfer contained "instructions referencing 'DGT,'" which the government speculates may be a reference to the Congolese Direction Générale du Trésor, a completely different public Congolese agency than the one that received the invoice. (*Id.*)

On December 4, 2013, António José da Silva Veiga, a Portuguese businessman and the manager of Ecree (*Id*. ¶ 13; ECF No. 14, ¶ 3), incorporated Sebrit Limited ("Sebrit").  (AC ¶ 15.) Sebrit was in turn wholly owned by Voxxi Limited ("Voxxi"), of which Mr. Veiga is the sole director and shareholder.  (*Id.*)  The Amended Complaint alleges, however, that "under a pair of contracts signed on or about July 16, 2013, the true owner of Voxxi was [Claudia] Sassou Nguesso."  (*Id.*)  The Amended Complaint does not plead any facts about these contracts, their terms, the signatories, or explain how this pair of contracts superseded the documents identifying Mr. Veiga as the sole director and shareholder.  Shortly thereafter, Energy & Mining Asp, a company whose "business purpose is described as acting as a holding company for certain Asperbras Group entities," signed a contract to pay Sebrit USD 19.5 million for a "Geophysical Report" and "search[ing] for new business to [*sic*] the client [Energy & Mining Asp]."  (*Id*. ¶ 17 (alterations in original).)  The Amended Complaint alleges on information and belief that Sebrit

6

"did not provide significant services under the contract," but alleges no factual basis for this apparent speculation.  (*Id.*)

On December 13, 2013, Asperbras transferred EUR 37,000,036 from its BES account that received the Initial Transfer to an unidentified "Cayman Islands-based account" account at BES Investimento do Brasil ("BES Investimento").  (*Id.* ¶ 18.)  Three days later, an account at BES Investimento transferred EUR 35,891,875 to an account held by Energy & Mining Asp at Banco Internacional de Cabo Verde ("Banco Internacional").  (*Id.*)  The Amended Complaint does not allege that the BES Investimento transferor account was the same account that received the EUR 35,891,875 transfer, it does not allege the identity of the accountholder for this transferor account, nor does it allege that the transferor account was "a Cayman Islands-based account."  After a few currency conversions and intrabank transfers, by January 6, 2014, Energy & Mining Asp's account at Banco Internacional contained EUR 47.8 million.  (*Id.* ¶ 20.)  That same day, Energy & Mining Asp wired EUR 14.3 million (approximately USD 19.5 million) from this account to Sebrit's account at Banco Internacional.  (*Id.*)  As described more fully below, the Amended Complaint alleges that the Funds used to purchase the Apartment are traceable to this EUR 14.3 million.  (*Id.* ¶¶ 22, 28.)[3]

The Amended Complaint also describes three other sets of transfers.  *First*, Energy & Mining Asp transferred EUR 14,911,036 and USD 23,104,856 into accounts at BES Investimento in December 2013, and accounts at BES Investimento subsequently transferred USD 31,065,572 into Energy & Mining Asp's account at Banco Internactional.  Here too the Amended Complaint does not allege that these BES Investimento transferor accounts were the same accounts that

---

[3]    Attached as Exhibit B is a chart outlining the flow of funds as alleged in the Amended Complaint.

received the EUR 14,911,036 and USD 23,104,856 transfers, nor does it allege the identity of the accountholders of these transferor accounts. (*Id*. ¶ 19.) *Second*, between 2011 and 2014, Asperbras Importacao e Exportacao, an entity alleged to be "affiliated" with Asperbras, "instructed the Congolese government to send invoiced payments to BES Investimento with instructions to credit Asperbras Importacao e Exportacao for the amount of payment," although the Amended Complaint does not allege the basis for these invoices, or that any such transfers were actually made. (*Id*.) With respect to these two sets of transfers, the Amended Complaint alleges that "the Asperbras Group commonly used accounts held at BES Investimento in the Cayman Islands as intermediaries for Congo-related money transfers" (*id*.), but it does not allege that any of the BES Investimento accounts involved in these transfers were "Cayman Islands-based account[s]." *Third*, on January 6, 2014, Energy & Mining Asp wired EUR 33.4 million from its account at Banco Internacional to another Banco Internacional account owned by Gabox Limited, a "shell company believed to be controlled by President Nguesso's son, Denis-Christel Sassou Nguesso." (*Id*. ¶¶ 16, 21.) The Amended Complaint characterizes this transfer as an "example[] of Congolese state money being routed through Asperbras-controlled entities," although it does not allege that the funds in this transfer came from the Congo, or otherwise allege facts suggesting that this was an example of the use of Congolese state money.

Following these transfers, "Sebrit, Veiga, and/or Claudia Sassou Nguesso hired" nonparty law firm K&L Gates to assist with the purchase the Apartment "for the benefit of Sassou Nguesso." (*Id*. ¶ 22.) K&L Gates incorporated Ecree on May 30, 2014, and after it was formed, it began the purchasing process for the Apartment. (*Id*. ¶¶ 23-24.) The purchase application listed Ecree as the "Applicant," Sebrit as the "Business or Employer" of the Applicant, and "Claudia Lemboumba" as the "[n]ame of all persons who will reside in this unit." (*Id*. ¶ 24.) In July 2014,

Mr. Veiga and Claudia Sassou Nguesso discussed various aspects of the purchase application, and Ecree purchased the apartment for USD 7.1 million that month using funds that were wired from accounts held by Sebrit at Banco Internacional.  (*Id*. ¶¶ 25-27.)  Mr. Veiga, the manager of Ecree, which owned the Apartment, has maintained the Apartment since that time, including by rendering payment for common-area charges.  (*Id*. ¶¶ 29-30.)

The Amended Complaint concludes, in a section captioned "Foreign Law Basis for Forfeiture," with a recitation of excerpts of Article 177 of the Penal Code of Congo and Articles 53 and 54 of the Constitution of the Republic of Congo.  (*Id*. ¶¶ 31-33.)[4]

## PLEADING STANDARDS

The Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions "expressly permit motions to dismiss under Civil Procedure Rule 12(b), but subject those motions to Supplemental Rule G(2)'s heightened pleading standard, rather than the familiar standard of Civil Procedure Rule 8(a)." *United States v. $32,507.00 in U.S. Currency*, 2014 WL 4626005, at *1 n.1 (S.D.N.Y. Sept. 16, 2014).  Supplemental Rule G(2)(f) requires a civil forfeiture complaint to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."   Accordingly, a "complaint must 'assert specific facts supporting an inference that the property is in fact subject to forfeiture.'" *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 369 (S.D.N.Y. 2008) (quoting *United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Account No. 584007381 in the Name of Ishar Abdi & Barbar Abdi*, 255 F. Supp. 2d 56, 66-67 (E.D.N.Y. 2003)).  "These requirements are 'more stringent than the general pleading requirements[,] an implicit accommodation to the

---

[4]    The Amended Complaint also makes reference to Article 178 of the Penal Code of Congo but does not provide the text of that statute or otherwise discuss its contents or relevance.  (AC ¶ 31.)

drastic nature of the civil forfeiture remedy." *Id.* (quoting *United States v. $15,270,885.69*, 2000 WL 1234593, at *2-3 (S.D.N.Y. Aug. 31, 2000)).

## ARGUMENT

**I.      The Amended Complaint fails to properly plead the Specified Unlawful Activities that are the basis for all the forfeiture claims.**

The government's forfeiture claims can succeed only if it establishes that the Funds used to purchase the Apartment are traceable to "misappropriation, theft, or embezzlement of public funds" of the Congolese government "by or for the benefit of a public official" of the Congo, or that the Funds were "stolen, converted or taken by fraud" from the Congolese government. Because the Amended Complaint has failed to plead either of these SUAs, much less allege facts supporting a reasonable inference that these SUAs occurred, it must be dismissed.

> *A.      The Amended Complaint fails to allege that the Initial Transfer involved the misappropriation, theft or unlawful taking of funds of the Congolese government.*

The allegations in the Amended Complaint begin with the Initial Transfer on November 28, 2013 of EUR 491 million to an account held by Asperbras with "an apparent reference to the Congolese Direction Générale du Trésor," a Congolese public agency.  (AC ¶14.)  Although the Amended Complaint insinuates that this was partial payment for a November 8, 2013 invoice from Asperbras to a different Congolese public agency "for approximately EUR 491 million as partial payment for the construction of approximately 12 hospitals in Congo" (*id.*), it fails to actually allege that the payment of EUR 491 million was made with funds of the Congolese government, a telling deficiency given that the government presumably knew the source of funds transferred to Asperbras when it drafted the Amended Complaint.  Because the  Amended Complaint failed to plead that the payment was made with funds of the Congolese government, it necessarily has failed to plead that the transfer was a misappropriation from the Congolese government.

Even if the Initial Transfer was made by the Congolese government, however, the Amended Complaint alleges no facts suggesting that the Initial Transfer constituted a misappropriation or theft or otherwise violated any of the Congolese laws cited by the Amended Complaint.  As Ecree pointed out in its MTD Letter, the Original Complaint did not allege that the EUR 491 million paid to Asperbras "were procured through a violation of Congolese law."  (Gov. MTD Letter at 2.)  The government has not disputed this, noting that "it is not alleging that Asperbras's November 8, 2013, 491 million-Euro invoice for the construction of 12 hospitals in Congo was a sham."  (*Id*.)  The government does not dispute that the Initial Transfer was lawful, and the Amended Complaint contains no allegation that the hospitals were not built, or even an allegation that EUR 491 million was excessive or an above-market price for building 12 hospitals, much less factual allegations supporting an inference that Asperbras charged this price as part of a scheme to misappropriate or otherwise unlawfully take funds from the Congolese government. (Ecree MTD Letter at 2.)  After Ecree raised this issue in its MTD Letter, the government stuck to its position that the Initial Transfer was lawful, and added no new allegations in the Amended Complaint that the Initial Transfer violated any of the Congolese laws concerning misappropriation of public funds that the government cites as its "Foreign Law Basis for Forfeiture."  (AC ¶ 31-33.)  As a result, the Amended Complaint *cannot* state a plausible claim for forfeiture that is predicated *in any way* on the notion that Initial Transfer was illegal under Congolese law.

> B.    *The government's suggestion that funds were "diverted" from the Congolese government after the Initial Transfer relies on a simple misuse of the term "diversion," rather than factual allegations supporting an inference that either SUA occurred.*

Instead of alleging facts suggesting that the Initial Transfer was an unlawful misappropriation under Congolese law, the government has argued that establishing this fact is

unnecessary because "the core of the Government's case is that certain funds were illegally
*diverted* from the 491 million Euros in state funds paid to Asperbras, in violation of Congolese
law, in order to buy the apartment for the Congolese president's daughter, herself a public official."
(Gov. MTD Letter at 2 (citing OC ¶¶ 14-26) (emphasis in original).) This argument is nonsensical
in light of the government's concession that the Amended Complaint does not allege that "the 491
million Euros paid to Asperbras by the Congolese state were procured through a violation of
Congolese law" or "that Asperbras's November 8, 2013, 491 million-Euro invoice for the
construction of 12 hospitals in Congo was a sham." (*Id.*) If Asperbras obtained the entire EUR
491 million Initial Transfer lawfully, as the government concedes, then the money was not
"diverted" before it was obtained by Asperbras.

A more legally coherent (though factually unsupported) theory for the government might
have been that the predicate illegal conduct under Congolese law consisted of a Congolese public
official illegally inflating the amount of the Initial Transfer with the intent that Asperbras would
pass along that inflated amount for the personal benefit of Claudia Sassou Nguesso. As explained
above, however, such a theory is foreclosed by the government's concession that "the 491 million
Euros paid to Asperbras by the Congolese state were [not] procured through a violation of
Congolese law." (*Id.*) Recanting that fatal concession would still not help the government,
however, because the Amended Complaint does not even allege *that this is what happened*. As
Ecree pointed out in its MTD Letter, the Original Complaint did not "allege that some portion of
Initial Transfer was earmarked for purposes other than building these hospitals." (Ecree MTD
Letter at 2.) The government did not dispute this failing in its MTD Letter, and the Amended
Complaint added no new allegations whatsoever even suggesting that any aspect of the EUR 491
million was intended for anything other than lawful payment for services rendered. The Amended

Complaint does not allege anything about the content, nature, or even the existence of the agreement resulting in the Initial Transfer that could give rise to an inference that the Funds derived from illegal activity. There is simply no factual support in the Amended Complaint for the government's contention in its letter that "certain funds were illegally *diverted* from the 491 million Euros in state funds paid to Asperbras." (Gov. MTD Letter at 2.)

Having lawfully obtained this payment, any subsequent transaction Asperbras undertook with these funds is not a "diversion" of public funds; it is a use of *private* funds. Asperbras is a private company, not a government entity. If funds were subsequently diverted from Asperbras, this would not violate the Congolese laws the government cites, which apply to government funds, not private funds. But even if it could have, the Amended Complaint also does not allege that the funds *were* diverted from Asperbras. Rather, the government alleges only that after receiving the Initial Transfer, Asperbras transferred a small amount of the funds it received in the Initial Transfer to Energy & Mining Asp, which the government alleges is an affiliate of Asperbras, and that this affiliate entered into a contract with Sebrit for which Energy & Mining Asp was overcharged. This falls far short of alleging that these funds were "diverted" from Asperbras, much less misappropriated from the Congolese government or otherwise used in a violation of the Congolese laws cited by the government. *First*, the Amended Complaint fails to allege any facts suggesting that Asperbras or Energy & Mining Asp were holding the funds for the benefit of the Congolese government or that it otherwise had any claim on the funds after the Initial Transfer. Accordingly, any use of these funds would not be a misappropriation from the Congolese government. *Second*, the Amended Complaint's allegations that Sebrit "did not provide significant services under the contract" with Energy & Mining Asp at most would suggest that Energy & Mining Asp may have a breach of contract claim against Sebrit, not that Sebrit misappropriated the funds. *Third*, the

Amended Complaint does not even allege any factual basis for its suggestion that Sebrit did not provide significant services, instead offering this allegation only as a speculation pled "upon information and belief" without any suggestion of what that information might be. This is insufficient under Supplemental Rule G, which requires the pleading of *specific facts* supporting an inference that the property is in fact subject to forfeiture. *Fourth*, none of the parties to these contracts is alleged to be a Congolese person, much less a Congolese public official. Nor does the Amended Complaint allege that Sebrit's "Geophysical Report" or "search[] for new business to [sic] the client [Energy & Mining Asp]" even had any connection to the Congo. Without identifying any nexus to the Congo, the Amended Complaint fails to plausibly allege any basis to conclude that these contracts are even plausibly subject to Congolese law.

But a bit more to the point, it fails to allege that any public official in the Congo had anything to do with the contract with Sebrit, or engaged in conduct illegal under Congolese law. Even if Energy & Mining Asp overpaid for Sebrit's services, as the Amended Complaint implies, that is not a plausibly alleged basis to conclude that this agreement was illegal under Congolese anticorruption laws on which the government relies for both SUAs.

C.    *The Amended Complaint fails to allege that any Congolese government official "used the power of their ranks for corruption" or otherwise violated the Congolese law that is the basis for the Specified Unlawful Activities.*

The SUAs identified in the Amended Complaint—a misappropriation of public funds or a transfer of stolen or fraudulently obtained funds—are premised on Congolese law barring "government officials from 'using their power of their ranks for corruption.'"  (AC ¶ 32 (quoting Article 177 of the Penal Code of Congo).)[5]  However, the government has failed to plead a single

---

[5]    The references to articles 53 and 54 of the Constitution of the Republic of the Congo do not provide an alternate basis for concluding that there was a violation of Congolese anticorruption law.  (AC ¶ 33.)  These constitutional provisions are vague, and the Amended Complaint does not provide even a conclusory articulation of how any of the alleged conduct violates the general

instance of a Congolese government official using the power of their government position for corruption.

The three Congolese nationals identified in the Amended Complaint are Claudia Sassou Nguesso, her brother Denis-Christel Sassou Nguesso and their father President Denis Sassou Nguesso.  Although the Amended Complaint describes Denis-Christel Sassou Nguesso and Claudia Sassou Nguesso as "government insiders" (*id*. ¶ 16), it fails to allege when they were public officials or what positions they held at those times.  The Amended Complaint contains no allegations at all that Denis-Christel Sassou was a public official.  As to Claudia Sassou Nguesso, the Amended Complaint alleges only that she "is President Nguesso's daughter" and that "[b]etween approximately 2013 and the present (the 'relevant time period'), [Claudia] Sassou Nguesso was also at various times a member of parliament in Congo and the head of communications for President Nguesso." (*Id*. ¶ 11.)  There are two problems with this allegation. *First*, it fails to identify the times between 2013 and 2024 during which Claudia Sassou Nguesso held these positions.  If she did not hold these positions at the times the relevant transactions occurred, then there is no factual basis for inferring that laws against corruption by public officials applied to her.  *Second*, the Amended Complaint contains no basis for inferring that holding a staff position as the head of communications for her father made Claudia Sassou Nguesso a public official.  Because the Amended Complaint fails to allege when Claudia Sassou Nguesso was a public official, it fails to plead a violation of the foreign law underlying both SUAs.

---

principles that "[t]he property of the State is sacred. Property in the public domain is inalienable, non-transferable, imprescriptible, and unseizable. Every citizen must respect and protect [the state property]," or that "[a]ny act of sabotage, vandalism, corruption or squandering or denigration of public funds is prohibited and punished by the conditions laid down by law." (*Id*.)  The only "condition laid down by law" identified in the Amended Complaint is the prohibition of government officials "using their power of their ranks for corruption."

The Amended Complaint also fails to allege that any of these three Congolese nationals used the power of a public position for corruption, or even alleged a single action that they took as a public official. There are no allegations in the Amended Complaint about any actions taken by President Sassou Nguesso at all, much less any that relate to the Initial Transfer, the purchase of the Apartment or any of the intermediate transfers or alleged events. As for Denis-Christel Sassou Nguesso, there are no allegations about any actions he took as a public official. The only allegation relating to him is that, "based on other correspondence," the company Gabox Limited was "apparently associated with" him. (*Id.* ¶ 16.) There is no allegation, however, that Gabox Limited has anything to do with the purchase of the Apartment. So, even if the Amended Complaint's speculation about an apparent association with Gabox Limited were correct, this would not be a use of the power of his position, would not involve alleged corruption, and would not come close to implying that the Funds used to purchase the Apartment were traceable to a corrupt act by a Congolese public official.

As to Claudia Sassou Nguesso, the Amended Complaint fails to identify any action that she took as a public official, much less any action she took that could be characterized as using the power of a public position for corruption. The closest that the government comes to alleging actions taken by Claudia Sassou Nguesso relate to the corporate entity Voxxi and her discussions with Mr. Veiga related to purchasing the Apartment. The government alleges that that "under a pair of contracts signed on or about July 16, 2013, the true owner of Voxxi [the 100% owner of Sebrit] was [Claudia] Sassou Nguesso." (*Id.* ¶ 15.) The Amended Complaint concedes that these contracts, which are not further described, conflict with Voxxi's corporate records listing Mr. Veiga as the sole director and shareholder of Voxxi. (*Id.*) Even assuming that this cryptic allegation is true, however, this is not a plausible allegation of any illegal conduct under Congolese

law.  The Amended Complaint offers no reason why ownership of foreign corporate entities is illegal under Congolese law.  The Amended Complaint also does not allege that Claudia Sassou Nguesso had anything to do with the formation of Sebrit nor with its management.  Indeed, by all accounts in the Amended Complaint, it was actively managed by Mr. Veiga, not her.  Nor, most importantly, does it allege that she directed, participated in, or even had knowledge of the contract between Energy & Mining Asp and Sebrit.  As for the Apartment, the Amended Complaint does not allege that she ever owned it.  Rather, it concedes that "Ecree submitted a Purchase Application" to purchase the Apartment and ultimately purchased the Apartment.  (*Id.* ¶ 24.)[6] Claudia Sassou Nguesso was listed "in the part of the application that asked for the '[n]ame of all persons who will reside in this unit'" (*id.*), but the Amended Complaint concedes that she never actually lived there and that it "has remained unoccupied since it was purchased" (*id.* ¶ 30).

The string of independently fatal gaps in the Amended Complaint's factual allegations relating to the purported violation of Congolese anticorruption laws underlying the SUA claims is stunning.  The Amended Complaint does not come close to alleging that a Congolese public official used the power of their position for corruption by misappropriating public funds.  *First*, it fails to allege that Claudia Sassou Nguesso was even a public official when the relevant actions occurred.  *Second*, it fails to allege any way in which Claudia Sassou Nguesso used the power of her position, much less used it in connection with the relevant transactions.  *Third*, it fails to allege that the funds in the Initial Transfer were public funds transferred by the Congolese government.  *Fourth*, it fails to allege any way in which Claudia Sassou Nguesso participated in or was even

---

[6]    The government at one point characterizes the purchase application submitted by Ecree as "[Claudia] Sassou Nguesso's purchase application." (AC ¶ 25.)  The most charitable interpretation of this false allegation is that it was an inadvertent typo, given that, in fact, "Ecree submitted [the] Purchase Application," not Claudia Sassou Nguesso, and Ecree was the purchaser of the Apartment.  (*Id.* ¶ 24.)

aware of the Initial Transfer or the hospital construction contract for which the Initial Transfer was allegedly payment. *Fifth*, it fails to allege that Claudia Sassou Nguesso had any interest in Asperbras, the private company that received the Initial Transfer, which was the only transfer that the Amended Complaint ever suggests may have involved public funds. *Sixth*, it fails to allege that Asperbras entered into this agreement to build the hospitals with the intent of benefiting Claudia Sassou Nguesso, much less plead specific facts supporting such an inference, as required by Supplemental Rule G. *Seventh*, it alleges that Claudia Sassou Nguesso did not purchase the Apartment and fails to allege that she had an ownership interest in the company that purchased the Apartment. *Eighth*, although it alleges that the purchase application identified Claudia Sassou Nguesso as a potential tenant of the Apartment, it concedes that she never resided in the Apartment.

*United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1 (D.D.C. 2013) is instructive as to why these insufficiencies are fatal to the Amended Complaint. There, the government sought forfeiture of a Gulfstream jet purchased by Teodoro Nguema Obiang Mangue, a government official in Equatorial Guinea and also the son of the president, with public funds allegedly derived from extortion, misappropriation, theft, and embezzlement under Equatoguinean law. *Id*. at 1. That complaint's theory of forfeiture was "that a group of Equatoguinean individuals—dubbed the Inner Circle—has amassed great wealth by siphoning funds from the public fisc" and that "members of the Inner Circle, such as Nguema, demand[ed] payments from companies doing business in [Equatorial Guinea], in exchange for the performance of official acts." *Id*. at 15. For example, it alleged that "in order to engage in logging in [Equatorial Guinea's] National Forests, timber companies must first receive a logging concession from Nguema. Nguema demands that timber companies seeking to obtain such concessions first pay him a personal fee." *Id*. But the court held that the complaint failed to plausibly state a claim because it

failed to allege "what companies were victim to this scheme, or when this occurred, or which members of the Inner Circle were behind the acts," and many allegations did "not even give rise to an inference of illegal activity" or "ma[d]e no mention of Nguema whatsoever." *Id.* Here the government's pleading failures are even more extreme. The Amended Complaint contains no allegations about who in the Congolese government concocted the alleged diversion scheme, when or how it was concocted, how its implementation involved acts by any public officials, much less acts by which Claudia Sassou Nguesso used her public position, and fails to identify how any transfer of public funds, or indeed any transfer of private funds, was unlawful. "Absent some specific indication that the [Apartment] is derived from or traceable to illicit activity, the complaint must be dismissed." *Id*. at 16.

*     *     *

In sum, the Amended Complaint lobs an general accusation of corruption against the entire Congolese government, describes without detail certain transactions that no public officials are alleged to have been involved in, cuts and pastes Congolese law, and leaves it as an exercise to the reader to find something illegal. Even if the government does attempt to "paint[] a troubling picture of endemic corruption in [the Congo,] the government has done so with brushstrokes that are much too broad. The government cannot proceed by casting general allegations of lawlessness in the country in which the relevant transactions took place." *One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d at 16. Because the Amended Complaint fails to plausibly allege violations of Congolese law, it must be dismissed. *See United States v. $1,399,313.74 in U.S. Currency*, 592 F. Supp. 2d 495, 499 (S.D.N.Y. 2008) ("The principal new allegation in support of the narcotics-trafficking theory is that many of the funds were sent from Latvia, which the Government asserts

is a notorious money laundering haven. This does not raise the right to relief above a speculative level.").

## II.    The Amended Complaint also fails to plead a violation of 18 U.S.C. § 2314 because no basis for scienter is alleged.

In addition to failing to allege any Specified Unlawful Activity for the reasons given above, the Amended Complaint's attempt to plead a violation of 18 U.S.C. § 2314, which is one of the two SUAs on which it relies, also fails for the independent reason that it does not allege any fact supporting a reasonable inference of scienter.  As discussed above, Section 2314 prohibits the transmittal of money by a person "knowing the same to have been stolen, converted or taken by fraud."  The Amended Complaint fails to allege that any person who transmitted funds internationally had this knowledge.  Instead, it repeatedly and consistently describes Section 2314 as a prohibition on *any* "international transportation or receipt of stolen or fraudulently obtained property," without mentioning the requirement that the transmitter must know that the transmitted funds were stolen, converted or taken by fraud.  (AC ¶¶ 3, 35, 38, 41, 44, 47.)  This simply misstates the statutory requirements.  Because the government fails to plead acts supporting a reasonable inference that a person engaging in an international transmittal of funds knew that the transmitted funds were stolen, converted or taken by fraud, the government cannot rely on Section 2314 as the SUA for any of its claims.  *See Kades v. Organic Inc.*, 2003 WL 470331, at *9 (S.D.N.Y. Feb. 24, 2003) ("To establish a violation of [] section 2314, it must be shown . . . that the defendant knew 'the [money] to have been stolen, converted or taken by fraud.'").

## III.    The Amended Complaint fails to allege that the Funds used to purchase the Apartment are traceable to the Initial Transfer.

Even if the Amended Complaint did adequately allege that funds in the Initial Transfer were somehow associated with conduct that was illegal under Congolese law and thus constituted Specified Unlawful Activity, which it clearly does not, it fails to plausibly allege that the

Apartment was derived from or traceable to that money, which is an independent requirement of 18 U.S.C. §§ 981(a)(1)(A)&(C), the forfeiture statutes on which all the claims rely.

The Amended Complaint attempts to sketch of the flow of funds that were used to purchase the Apartment (AC ¶¶ 14, 18, 19, 20, 26-27) and concludes that "the money used to purchase the [Apartment] was a portion of the approximately USD 19.5 million of Congolese state funds" (*id.* ¶ 28). But there is a critical "gap in the Government's recitation of the flow of funds in this case." (Gov. MTD Letter at 2.) The Amended Complaint alleges that the Initial Transfer occurred when a "Portugal-based bank account held by Asperbras LLC at the now defunct Banco Espirito Santo ('BES') received a wire transfer in the amount of approximately EUR 491 million." (AC ¶ 14.) It then alleges that "[o]n or about December 13, 2013, . . . Asperbras LLC sent approximately EUR 37,000,036 from th[at] BES account . . . to a Cayman Islands-based account at BES Investimento do Brasil ('BES Investimento')." (*Id.* ¶ 18.) On December 16, 2013, "BES Investimento sent approximately EUR 35,891,875 to a EUR-denominated bank account held by Energy & Mining Asp at Banco Internacional de Cabo Verde ('Banco Internacional')." (*Id.*) But the Amended Complaint does not allege who the accountholder was for either the "Cayman Islands-based account at BES Investimento" that received the EUR 37,000,036 transfer, nor from whose account "BES Investimento sent approximately EUR 35,891,875" to Energy & Mining Asp's account at Banco Internacional. In fact, it does not even allege that the transfers were made into and out of the *same account* at BES Investimento. The Amended Complaint therefore fails to allege specific facts supporting the inference that any portion of the Initial Transfer, even the portion the government contends was "diverted," was used to purchase the Apartment, and therefore fails to allege that the funds used to purchase the Apartment were "traceable to violations of specified unlawful activities and U.S. law." 18 U.S.C. § 981(a)(1)(C).

The Amended Complaint attempts to shore up this gap by alleging that "[f]inancial records reflect that the Asperbras Group commonly used accounts held at BES Investimento in the Cayman Islands as intermediaries for Congo-related money transfers." (AC ¶ 19.) But these allegations do nothing for the government. Its first example is that "in December 2013, the same month that Asperbras LLC sent the [EUR 37,000,036 transfer described above] to and through BES Investimento, Asperbras LLC also sent approximately EUR 14,911,036 and USD 23,104,856 to BES Investimento, days after which BES Investimento sent approximately USD 31,065,572 to Energy & Mining Asp's USD-denominated bank account at Banco Internacional." (*Id.*) This allegation sheds no light on the gap in the Amended Complaint's flow of funds. For this transfer too, the Amended Complaint does not allege the identity of the accountholder for the recipient and transferor accounts at BES Investimento, nor does it allege that those were even the same account. Moreover, the Amended Complaint does not actually allege that these were Cayman Islands-based bank accounts. Even if it did, this is hardly evidence that "the Asperbras Group commonly used accounts held at BES Investimento in the Cayman Islands as intermediaries for Congo-related money transfers," not least because the Amended Complaint does not actually allege these transferred funds had any connection to the Congo. And finally, true to form, there is no allegation that any aspect of this transfer was illegal under Congolese law nor, even if it were, that it had anything to do with the transfers at issue in the Amended Complaint.

The Amended Complaint's second example is that "between in or about 2011 and 2014, another entity, Asperbras Importacao e Exportacao, which, on information and belief, I believe to be affiliated with Asperbras LLC, periodically instructed the Congolese government to send invoiced payments to BES Investimento with instructions to credit Asperbras Importacao e Exportacao for the amount of payment." (*Id.*) The Amended Complain again fails to allege that

any of these accounts were "Cayman Islands-based," and whatever the conclusory affiliation alleged between Asperbras Importacao e Exportacao and Asperbras, the Amended Complaint articulates no reason why these transfers have anything to do with this case, much less that they fill the gap in the Amended Complaint's recitation of the flow of funds.

As a result, not only does the Amended Complaint fail to allege that either the Initial Transfer or any subsequent transfers were unlawful, it does not even allege facts from which it can be reasonably inferred that the Apartment was purchased with funds traceable to those transfers. This is no mere technicality—it is a gaping hole in the Amended Complaint's factual predicate that the Apartment is subject to forfeiture because it was purchased with money illegally obtained under Congolese law.

## CONCLUSION

For the reasons stated above, the Court should grant Ecree's motion to dismiss the Amended Complaint.

Dated:  August 2, 2024

Respectfully submitted,

PRYOR CASHMAN LLP


By:      /s/ Jeffrey Alberts

Jeffrey Alberts
Aaron Wiltse
7 Times Square, Suite Level 40
New York, NY 10036
Tel: 212-326-0800
Email: jalberts@pryorcashman.com
Email: awiltse@pryorcashman.com

*Counsel for Claimant Ecree LLC*