UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-02420-KPF |
| | ) | |
| REAL PROPERTY LOCATED AT 1 | ) | |
| CENTRAL PARK WEST, NEW YORK, | ) | |
| NEW YORK 10023 | ) | |
| | ) | |
| | ) | |
| Defendant in Rem | ) | |
| | ) | |
| | ) | |

## UNITED STATES' OPPOSITION TO ECREE LLC'S MOTION TO DISMISS

Plaintiff United States of America ("the Government") respectfully opposes Claimant Ecree

LLC's ("Ecree") motion to dismiss ("MTD") the First Amended Complaint ("FAC"). (Dkt. 24).

I.      **Background**

A.      **Procedural Background**

This civil forfeiture case, which was originally filed on March 29, 2024 (Dkt. 1), arises out

of a scheme to misappropriate state funds belonging to the Republic of Congo ("Congo") for the

personal enrichment of Claudia Sassou Nguesso ("Sassou Nguesso"), the daughter of the long-

serving Congolese President, Denis Sassou Nguesso, and a Congolese public official herself at all

times relevant to the scheme. FAC ¶¶ 11, 32. In short, this case alleges that Unit 32G in 1 Central

Park West (the "Apartment") was purchased in 2014 for the benefit of Sassou Nguesso with funds

illegally diverted from an approximately €491 million payment made by the Congo to a Brazilian

conglomerate for the construction of hospitals. The Government is proceeding against the

Apartment under five separate causes of action, which allege, in summary, that the Apartment is forfeitable as property traceable to violations of:

(1) a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)) ("Foreign Misappropriation"), and the international transportation or receipt of stolen or fraudulently obtained property (18 U.S.C. § 2314) ("ITSP"), pursuant to 18 U.S.C. § 981(a)(1)(C);

(2) 18 U.S.C. § 1957, pursuant to 18 U.S.C. § 981(a)(1)(A)(money laundering);

(3) 18 U.S.C. § 1956(a)(1)(B)(i), pursuant to 18 U.S.C. § 981(a)(1)(A) (money laundering);

(4) 18 U.S.C. § 1956(a)(2)(B)(i), pursuant to 18 U.S.C. § 981(a)(1)(A) (money laundering); and

(5) 18 U.S.C. § 1956(h), pursuant to 18 U.S.C. § 981(a)(1)(A) (money laundering conspiracy).

(*See generally* id.).

The FAC pleads that U.S. money laundering laws were violated based on the commission of two specified unlawful activities ("SUAs") that give rise to the civil forfeiture: (1) Foreign Misappropriation, pursuant to 18 U.S.C. § 1956(c)(7)(B)(iv); and (2) ITSP, pursuant to 18 U.S.C. § 2314. *See* FAC ¶¶ 35 *et seq.* The Government's Foreign Misappropriation claim is keyed to violations of (1) Article 177 of the Penal Code of Congo, which prohibits Congolese government officials from "using their power of their ranks for corruption"; (2) Article 53 of the Congolese Constitution, which provides that "[t]he property of the State is sacred. Property in the public domain is inalienable, non-transferable, imprescriptible, and unseizable. Every citizen must respect and protect [the state property]"; and (3) Article 54 of the Congolese Constitution, which provides that "[a]ny act of sabotage, vandalism, corruption or squandering or denigration of public

2

funds is prohibited and punished by the conditions laid down by law." FAC ¶ 32.

On May 14, 2024, Ecree filed a claim of interest with respect to the Apartment. (Dkt. 14). On June 3, 2024, Ecree filed a letter seeking a pre-motion conference regarding its anticipated motion to dismiss the original complaint. (Dkt. 19). On June 5, 2024, the Government responded to Ecree's letter. (Dkt. 20). Following a conference in this matter on June 12, 2024, the Court ordered the Government to file an amended complaint by July 12, 2024. The Government timely filed the FAC on July 12, 2024. Dkt. 22. This motion followed on August 2, 2024. (Dkt. 23-24).

### B.    Factual Background

As alleged by the FAC, on or about November 28, 2013, a Congolese public agency wired approximately €491 million (then worth approximately $658 million) to a bank account at Banco Espirito Santo ("BES") in Portugal controlled by the Brazilian construction company Asperbras to build hospitals in the Congo that had been commissioned by another Congolese public agency (the "Initial Transfer"). FAC ¶ 14. In the ensuing months, nearly $20 million of these Congolese funds were illegally siphoned away by Jose Veiga—a Portuguese businessman and intermediary between Asperbras and the Nguesso family— and Sassou Nguesso through a web of international wire transfers involving multiple, contemporaneously-formed overseas shell companies. *Id.* ¶¶ 13, 15-17.

At the core of the scheme, however, was a sham contract between Asperbras holding company Energy & Mining Asp and one of these shell companies, Sebrit Limited ("Sebrit"), which Veiga formed on or about December 4, 2013, just days after the Initial Transfer of €491 million transfer. *Id.* ¶¶ 15, 17. Under the contract, which was executed just a week later, on or about December 11, 2013, Energy & Mining Asp agreed to pay Sebrit approximately $19.5 million to generate a "geophysical report" and "search for new business," even though Sebrit's principal

business purpose was listed in its corporate documents in Cyprus as investment and financial services. *Id.* ¶¶ 15, 17. That is because Sebrit—which was really a front for Sassou Nguesso, who was then a member of the Congolese parliament and the head of communications for her father, President Nguesso —had no intention of providing any genuine services under the contract, and the actual purpose of the contract was to divert this approximately $19.5 million for Sassou Nguesso's benefit. *Id.* ¶¶ 11, 15-17, 32.

On or about December 13, 2013—that is, only two days after the Sebrit-Energy & Mining Asp contract was executed—Asperbras sent approximately €37 million out of its approximately €491 million balance at BES in Portugal to a Cayman Islands-based account at a BES subsidiary, BES Investimento do Brasil ("BES Investimento"). *Id.* ¶ 18. The next business day, BES Investimento sent approximately €35.8 million to an Energy & Mining Asp account at Banco Internacional de Cabo Verde ("Banco Internacional"), located in Cabo Verde, which was opened that same day. *Id*.

Asperbras executed other circuitous transactions like this in or about December 2013. *Id.* ¶ 19. For example, in or about that same month, Asperbras executed two transfers to BES Investimento in the amounts of approximately €14.9 million and approximately $23.1 million. *Id*. Within days of those transfers, BES Investimento wired approximately $31 million to Energy & Mining Asp's account at Banco Internacional. *Id*.

Shortly after the holiday season, on or about January 6, 2014, approximately $15.2 million of the approximately $31 million sitting in Energy & Mining Asp's dollar-denominated account at Banco Internacional was converted to approximately €11.1 million and transferred to Energy & Mining Asp's euro-denominated account at Banco Internacional, bringing the balance in that account to approximately €47.8 million. *Id.* ¶ 20. The same day, Energy & Mining Asp wired

4

approximately €14.3 million (then valued at approximately $19.5 million) from its euro-denominated account to Sebrit's euro-denominated account at Banco Internacional, which had been open for approximately a week (the "Diverted Funds"). *Id*. This Sebrit account received no additional deposits until in or about November 18, 2014—*i.e.*, well after the purchase the Apartment. *Id*.

On or about May 30, 2014, while the Diverted Funds were still sitting in Sebrit's euro-denominated account at Banco Internacional, U.S. law firm K&L Gates incorporated Ecree in New York at the behest of Sebrit, Veiga, and/or Sassou Nguesso. *Id.* ¶¶ 20, 22-23. On or about June 26, 2014, approximately $710,000, representing a 10% deposit on the $7.1 million Apartment, were paid out of the Diverted Funds (after being converted from euros to dollars) to the attorney trust account of another U.S. law firm representing the seller of the Apartment. *Id.* ¶ 26.

On or about July 12, 2014, Ecree submitted a Purchase Application to purchase the Apartment. *Id.* ¶ 24. Sassou Nguesso was listed as the intended occupant of the Apartment in this application, and Veiga was merely listed as a personal reference for Sassou Nguesso. *Id*. In the days that followed, Sassou Nguesso and Veiga exchanged emails and text messages regarding the purchase of the Apartment, including who should be listed as the Apartment's beneficial owner and/or occupant. *Id.* ¶ 25. The two ultimately concluded that there was little risk in listing Sassou Nguesso as the beneficial owner and/or occupant since it was "only for the condominium building"—in other words, they saw little risk of Sassou Nguesso's application being rejected or her being outed publicly as the true beneficial owner and/or occupant of the Apartment, even though she was a politically-exposed person, as a public official of the Congo and daughter of its President. *Id.* ¶¶ 11, 25, 32.

On or about July 28, 2014, approximately $6.525 million of the Diverted Funds were wired (after being converted from euros to dollars) to a K&L Gates account at Bank of America. *Id*. ¶ 27. On or about July 31, 2014, approximately $6.4 million of these funds was remitted to the seller's law firm to complete the purchase of the Apartment. *Id.* In the years following Ecree's nominal purchase of the Apartment, the Apartment's maintenance fees were paid by Veiga. *Id*. ¶ 29.

## II.    Legal Standard

In *United States v. Any & All Funds on Deposit in Acct. No. 0139874788, at Regions Bank, held in the name of Efans Trading Corp.,* No. 13 Civ. 7983 (KPF), 2015 WL 247391, *5 (S.D.N.Y. Jan. 20 2015), this Court cogently articulated the standard of review under Federal Rule of Civil Procedure 12(b) and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which governs here:

"Motions to dismiss *in rem* forfeiture actions are governed by Federal Rule of Civil Procedure 12(b) and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions." *In re 650 Fifth Ave.*, 777 F. Supp. 2d 529, 541 (S.D.N.Y. 2011); *see also* Fed. R. Civ. P. 12(b); Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules" or "Supp. R."). When considering such a motion, the Court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life. Ins. Co.*, 648 F.3d 98, 104 (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). A plaintiff will survive a motion to dismiss if they allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007); *see also In re Elevator Antitrust*

*Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile Twombly does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

Under Supplemental Rule G(2)(f), a complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." *United States v. $32,507.00 in U.S. Currency*, No. 14 Civ. 5118 (CM), 2014 WL 4626005, at *1 (S.D.N.Y. Sept. 16, 2014); *accord United States v. Real Prop. Known as Unit 5B of Onyx Chelsea Condo.*, No. 10 Civ. 5390 (KBF), 2012 WL 1883371, at *6 (S.D.N.Y. May 21, 2012). Accordingly, the Government's complaint must "assert specific facts supporting an inference that the property is subject to forfeiture." *United States v. $22,173.00 in U.S. Currency*, 716 F.Supp.2d 245, 248 (S.D.N.Y.2010) (citation omitted).

## III.    Argument

### A.    The FAC Sufficiently Pleads the Underlying SUA's

Ecree's first line of attack on the FAC is that it does not adequately plead violations of the two SUA's underlying the FAC's claims for relief—namely, (1) Foreign Misappropriation and (2) ITSP. This argument fails.

#### 1.    The FAC Adequately Alleges Foreign Misappropriation

Ecree begins by acknowledging that the FAC alleges that, on or about November 28, 2013, Asperbras received the €491 million Initial Transfer from the Congolese Direction Générale du Trésor, a Congolese public agency (FAC ¶ 14), but then bizarrely argues that the FAC "fail[s] to plead that the payment [for hospital construction] was made with funds of the Congolese government." (MTD at 10). The FAC "insinuates" nothing about the Initial Transfer (MTD at 10); it states plainly that the Initial Transfer was partial payment by the Congolese treasury for a

hospital construction project commissioned by a different Congolese public agency in or about November 2013. (FAC ¶ 14). The Court should reject Ecree's faulty reading of the FAC.

Ecree next takes issue with the Government's well-pled claim that the Diverted Funds, which were initially paid to Asperbras as part of the Initial Transfer, were "public funds" that were illegally diverted to Sebrit/Sassou Nguesso from Asperbras by way of Asperbras holding company Energy & Mining Asp. (MTD at 11-14). In essence, Ecree argues that the Congolese state funds paid to Asperbras ceased being "public funds" once they hit Asperbras's bank account, such that any downstream misappropriation of those funds was no misappropriation at all under Section 1956(c)(7)(B)(iv). (*See* MTD at 13 ("Having lawfully obtained this payment, any subsequent transaction Asperbras undertook with these funds is not a 'diversion' of public funds; it is a use of *private* funds.") (emphasis in original)).[1]

Ecree cites no authority for this crabbed reading of "public funds," and the Government has identified none. What authority there is supports the proposition that public funds *do not* stop being public funds simply because they are passed through a private intermediary.

For example, in *United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57 (S.D.N.Y. 2015) (*Prevezon I*), Judge Griesa denied a motion to dismiss in a civil forfeiture action involving

---

[1] Ecree also makes much of the Government's assertions on June 5, 2024, that "Ecree is correct that the Complaint does not allege that the 491 million Euros paid to Asperbras by the Congolese state were procured through a violation of Congolese law" and that "[t]he Government is not alleging that Asperbras's November 8, 2013, 491 million-Euro invoice for the construction of 12 hospitals in Congo was a sham." (Dkt. 20 at 2; *see also, e.g.,* MTD at 11-12). Perhaps a more artful drafting would have been to say that the Government is not alleging that the funds were "entirely" procured through a violation of Congolese law or that the hospital invoice was a "complete" sham. To anyone other than Ecree reading the FAC, however, the Government's theory would be plain: Congolese funds were illegally diverted from the Initial Transfer so they could be used in part to purchase the Apartment for Sassou Nguesso, not to construct hospitals back home. And, of course, as required by law, the Court's analysis is confined to the four corners of the FAC, which for the reasons discussed herein more than adequately pleads the Government's case. *See Efans Trading Corp.*, 2015 WL 247391, at *8, n. 9.

the proceeds of a massive tax fraud on the Russian government, which included a Foreign Misappropriation claim, as this case does. Even though the misappropriated public funds at issue in *Prevezon I* were laundered through an even more baroque web of transactions and private intermediaries—including many, many shell companies—the *Prevezon* defendants did not argue that the funds at issue no longer constituted "public funds" once they left Russian coffers, and the Foreign Misappropriation claim ultimately survived both a motion to dismiss, *see Prevezon I*, 122 F. Supp. 3d at 61-66, 73, and a motion for summary judgment. *See United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 693 (S.D.N.Y. 2017); *see also United States v. All Assets Held In Acct. No. XXXXXXX*, 83 F. Supp. 3d 360, 364-66, 376-77 (D.D.C. 2015) (denying motion to dismiss a civil forfeiture complaint against certain investment portfolios that allegedly contained the proceeds of two separate misappropriation schemes perpetrated by certain Nigerian public officials that were laundered through at least two private intermediaries). That is likely because the argument is so clearly without merit.

Here, the FAC alleges that private intermediary Asperbras received the Initial Transfer from a Congolese public agency for a hospital construction project commissioned by another Congolese public agency. FAC ¶ 14. Then, through a series of circuitous transactions involving multiple shell companies, the Diverted Funds ended up in a bank account that was ultimately beneficially owned by Sassou Nguesso, a Congolese public official, and thereafter used to purchase the Apartment for her benefit. *Id*. ¶¶ 11, 14-20, 22-28, 32. Just as the private intermediaries in *Prevezon* did not break the chain, thereby converting public funds to private ones,

neither did Asperbras or Energy and Mining Asp; they were merely stops along the circular path from public fisc to public official.[2]

Nor does logic support Ecree's position. Indeed, Ecree's ultranarrow reading of "public funds" would make it child's play for kleptocrats to misappropriate state funds while dodging liability under Section 1956(c)(7)(B)(iv). All they would need to do is simply contract with private companies for legitimate purposes, send large amounts of state funds to those private contractors, and then arrange for a portion of the money to be diverted once it was in the private contractors' hands. Here, the Diverted Funds were under Asperbras's control for barely over a month, during which they were sent from one subsidiary's bank account to another's with a layover in the Cayman Islands for no apparent business purpose, which highlights the strong inference that these funds were always intended as a kickback to Sassou Nguesso as a public official and never intended for hospital construction. But under Ecree's reading of the law, that is just fine. This would be a perverse outcome, unsupported by the letter of the law or any precedent. It would eviscerate Section 1956(c)(7)(B)(iv) as a tool for combating foreign public corruption by putting public funds beyond the reach of the law so long as they were funneled through a private entity.

The rest of Ecree's arguments with respect to the Government's theory of Foreign Misappropriation are at best arguments for the factfinder, not legitimate grounds for dismissing the FAC. (*See, e.g.,* MTD at 12-14). For example, Ecree would have the Court dismiss the FAC

---

[2] To the extent Ecree argues that the FAC is not specific enough about *when* Claudia Sassou Nguesso was a public official, that is a fact issue not warranting dismissal. The FAC's allegation that she has been a public official "at various times" from 2013 to the present (FAC ¶ 11) is enough "to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). For the record, public sources state that she was both a legislator and the President's communications head at the precise time the subject funds were misappropriated for her benefit, and the Government is prepared to plead this in a further amended Complaint should the Court so desire.

because it does not contain an explicit allegation that Asperbras's invoice for the hospital construction project was inflated so as to mask a kickback to Sassou Nguesso. Ecree is free to argue that to the factfinder, but the FAC, as fairly read, more than adequately pleads the Government's theory of illegal diversion that occurred here. Similarly, Ecree complains that the FAC does not allege explicitly that any Congolese public official was involved in the sham contract between Sebrit and Energy & Mining Asp. (MTD at 14). But, of course, the FAC alleges that Sebrit was really just a front for Sassou Nguesso, with Veiga as its nominal owner and director, and that Veiga was acting on Sassou Nguesso's behalf to consummate the purchase of the Apartment. FAC ¶¶ 15-17. Ecree ignores these allegations in hopes that this case will not have to be tried. The Court should not take the bait.

Everything alleged in the FAC about the treatment of the Diverted Funds is probative of Foreign Misappropriation, public corruption in violation of Congolese law, and money laundering—to name a few: the outsized contract for a public project in a poor country, the politically connected middleman, the offshore shell companies, the secret side contracts, the unexplained, circuitous transactions with no apparent economic purpose, the purchase of a luxury asset in a politically and economically stable country, the discussions about who should be listed as the beneficial owner of that asset, the tight timing of all of the above. *See* FAC ¶¶ 10-11, 13-30, 32. Some of the allegations refer to direct evidence of these crimes; others refer to circumstantial evidence. Ecree is free to make arguments about the weight and import of this evidence in closing to the factfinder; now is not the time.

Ecree's reliance on *One Gulfstream* is also unavailing. While Ecree cites relatively little caselaw in its brief, it does make an extended argument that the Government has not sufficiently pled a Section 1956(c)(7)(B)(iv) violation because the level of specificity in the FAC is supposedly

similar to what was rejected in by the United States District Court for the District of Columbia in that case. (*See* MTD at 18-19). The analogy fails.

In *One Gulfstream*, the Government sought to forfeit a Gulfstream jet, yet it did not identify any specific illegal transaction giving rise to the jet. It simply alleged in general terms that members of the Equatorial Guinea elite engaged in corrupt schemes and that the jet's owner (the President's son) had wealth far out of proportion to his salary. *See One Gulfstream*, 941 F. Supp. 2d at 14-16. By marked contrast, here, the Government has alleged that a specific contract— entered into by named parties on a specific day—and specific transactions pursuant to that contract were fraudulent and a means to divert Congolese funds for the benefit of a Congolese public official, Sassou Nguesso. This level of specificity is much greater than that rejected in *One Gulfstream*, and the Government has clearly pled "enough facts for the claimant to understand the theory of forfeiture, to file a responsive pleading, and to undertake an adequate investigation." *United States v. $22,173.00 in U.S. Currency*, No. 09 CIV. 7386, 2010 WL 1328953, at *2 (S.D.N.Y. Apr. 5, 2010).

### 2.    The FAC Adequately Alleges ITSP

Ecree's motion to dismiss devotes just a single paragraph to the Government's claim  that the Apartment constitutes proceeds of ITSP, arguing that the FAC fails to plead scienter by anyone who transported the fraudulently-obtained money. (MTD at 20). This argument also fails.

The FAC pleads that Veiga set up Sebrit as a shell company to benefit Sassou Nguesso and served as Sebrit's sole director and shareholder, through Sebrit's parent shell company Voxxi, which was secretly owned by Sassou Nguesso. FAC ¶¶ 15-16. Veiga then worked closely with Sassou Nguesso to purchase the Apartment in the name of yet another shell company (Ecree), whose beneficial ownership also rolled up to Sassou Nguesso, with funds that Sebrit diverted

through the sham contract with Energy & Mining Asp. *Id.* at ¶ 25; *see also* Dkt. 14 at ¶ 3 (Ecree pleading that its "sole manager" is Veiga). Thus, the FAC alleges that both Veiga and Sassou Nguesso were intimately involved in every step of the pled conduct, from the creation of Sebrit (Veiga created it for Sassou Nguesso), through the management of Sebrit (Veiga was its sole director), through the siphoning off of the Diverted Funds, through Sebrit's sending of part of those funds into the United States to purchase the Apartment in Ecree's name (Veiga was Ecree's sole manager), through the discussion of who should be listed as the occupant of the Apartment (Veiga and Sassou Nguesso discussed it at length), through the ongoing maintenance of the Apartment (Veiga paid for it). These pled facts create an overwhelming inference that when Sebrit wired the fraudulently-obtained funds into the United States to purchase the Apartment, Veiga was the person who orchestrated this conduct for the benefit of Sassou Nguesso. Thus, both Veiga and Sassou Nguesso acted with the requisite scienter.

One could also reasonably infer that Sebrit as an entity acted with scienter. Even courts that take a restrictive view of corporate scienter hold that "[t]he knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation*." Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 405 (S.D.N.Y. 2012) (quoting *Baker v. Latham Sparrowbush Assoc.,* 72 F.3d 246, 255 (2d Cir.1995)). Thus, for shell companies like Sebrit with just one natural person controlling their affairs and just one ultimate beneficial owner, the company's knowledge is coextensive with its controlling person's knowledge. If Sebrit took any action, Veiga and likely Sassou Nguesso knew about it, and vice versa. When Sebrit sent part of the Diverted Funds to purchase the Apartment, it clearly was not ignorant of the sham contract that had generated this money.

For the sake of completeness, the other elements of ITSP are also present. First, the Diverted Funds were "taken or converted by fraud" because the FAC pleads that a fraudulent contract was what diverted the money to Sebrit's possession. Specifically, Sebrit contracted to perform vague geophysical services in exchange for the Diverted Funds, but actually performed no such services and instead used the Diverted Funds for the personal enrichment of Sassou Nguesso. FAC ¶ 17. Ecree argues that the FAC "does not [] allege any factual basis for its suggestion that Sebrit did not provide significant services" (MTD at 14),[3] but that is incorrect. For example, the FAC alleges that Sebrit was a mere shell company run by Veiga for the benefit of Sassou Nguesso—neither of whom has any apparent expertise in the geophysical services that Sebrit contracted to perform. The FAC further pleads that at least $7.1 million of the money Sebrit received was not used to provide any services but rather was quickly used to purchase the Apartment for Sassou Nguesso. Moreover, whenever a plaintiff must "plead a negative"—in this case, that Sebrit *did not* perform any significant services—courts have recognized that the pleading burden is relaxed. *See, e.g., IFIXITUSA LLC v. iFixit Corp.*, No. CV-21-00887, 2022 WL 2117845, at *4 (D. Ariz. June 13, 2022) (citing cases); *Gray v. CitiMortgage, Inc.*, No. 16-CV-11295, 2017 WL 1058834, at *3 (E.D. Mich. Mar. 21, 2017); *Milacron LLC v. Stough Tool Sales*, No. 1:12-CV-119, 2012 WL 2366639, at *2 (S.D. Ohio June 21, 2012) ("It would be difficult as a practical matter to plead a negative with particularity."). For example, must the Government detail all the services Sebrit *did not* perform and recite everything Sebrit *did not* do? Obviously not. Rather, consistent with the established standards for "pleading a negative," the Government is entitled to simply plead that Sebrit did not perform any significant services under the contract. *See generally $22,173.00 in U.S. Currency*, 2010 WL 1328953, at *2 ("It is sufficient for the Government to

---

[3] Ecree makes this argument with respect to the other SUA, but it logically applies to both.

simply plead enough facts for the claimant to understand the theory of forfeiture, to file a responsive pleading, and to undertake an adequate investigation.").

Notably, fraud exists here whether or not the counterparty to the Sebrit contract—Energy & Mining Asp—knew about the contract's sham nature. If Energy & Mining Asp (and the Asperbras entities writ large) knew of the scheme, then Sebrit and the Asperbras entities defrauded the Congo. After all, the Republic paid Asperbras approximately €491 million to build public hospitals (FAC ¶ 14), but approximately $19.5 million of that money was diverted for the personal benefit of Sassou Nguesso, who is, as alleged in the FAC, the daughter of President of Congo, his communications director, and a member of the Congolese parliament. Conversely, if the Asperbras entities were innocently duped by the sham contract, then they were defrauded alongside the Congo: they paid approximately $19.5 million for services that Sebrit did not perform. *Id.* at ¶ 17.

Finally, the Diverted Funds were sent from Cabo Verde to the United States to purchase the Apartment, thus satisfying the cross-border element of ITSP. *Id.* at ¶¶ 18, 20, 26-27.

Notably, ITSP does *not* require that the Diverted Funds were public funds or that they were used for the benefit of a public official. In any event, as discussed above, the FAC alleges that the Diverted Funds were public funds that benefitted a public official.

Also irrelevant to the Court's analysis of ITSP is Ecree's argument that the FAC does not plead a violation of Congolese law. This is because the meaning of "stolen, converted or taken by fraud" in the ITSP statute is a question of U.S. federal law, not foreign law. *See United States v. Portrait of Wally*, 105 F. Supp. 2d 288, 292 (S.D.N.Y. 2000) ("federal law controls the question of whether an item is stolen" under the ITSP statute); *United States v. Portrait of Wally*, No. 99 CIV. 9940, 2002 WL 553532, at *23 (S.D.N.Y. Apr. 12, 2002) (same conclusion as to the "converted" prong of ITSP).

For all these reasons, Ecree has not raised any valid challenge against the ITSP SUA.

**B.    The FAC Sufficiently Traces the Diverted Funds Back to the Initial Transfer of Congolese State Funds to Asperbras**

Finally, Ecree argues that there is a tracing gap between the Initial Transfer and the Diverted Funds. (MTD at 20-230. Specifically, Ecree focuses on Paragraph 18 of the FAC and argues that the approximately €37 million sent from Asperbras on December 13, 2013 (which indisputably derives from the Initial Transfer) is not linked to the approximately €35.8 million that Asperbras entity Energy & Mining Asp received the next business day (which indisputably traces downstream to the Diverted Funds). In short, Ecree argues that there is a tracing gap between the December 13 money sent from Asperbras and the December 16[4] money received by Energy & Mining Asp.

This argument fails. As the FAC pleads, Asperbras sent approximately €37 million to BES Investimento on December 13 and BES Investimento sent approximately €35.8 million to Energy & Mining Asp the next business day. FAC ¶ 18. Given this tight date proximity and the near-identical transfer amounts, it is more than reasonable to infer that the money BES Investimento sent to Energy & Mining Asp derived from the money BES Investimento had just received from Energy & Mining Asp's corporate relative, Asperbras. This is particularly true given that the Asperbras entities routinely used BES Investimento as an intermediary institution to route funds. FAC ¶ 19. The pled facts create an overwhelming inference that this is precisely what Asperbras did with the December 13-16 money transfers at issue here. Here, again, Ecree is making a trial argument, not a pleading argument.

Forfeiture courts have accepted money traces that are far looser than the money trace

---

[4] In 2013, December 16 was one business day after December 13.

alleged here. For example, in *United States v. Approx. 32133.63 Tether (USDT) Cryptocurrency*, No. 22-CV-989, 2023 WL 5334352 (E.D. Wis. Aug. 18, 2023), the court ordered forfeiture of cryptocurrency worth approximately $30,200. The Government was able to directly trace $15,000 of these funds to a fraud scheme, through various cryptocurrency accounts, into the ultimate destination account. For the other $15,200 worth of cryptocurrency, the Government had no tracing at all, but the remaining amount of cryptocurrency in the fraudster's wallet matched up well with $15,200 in gift cards that the fraud victim had been induced to buy and send shortly before. The court held "that the totality of circumstances, as pleaded in the amended complaint, establish that the $15,200 in gift cards also is traceable to the [cryptocurrency] account . . . the timing of the transactions, along with the amount, indicate that most of the funds in the account were fraud proceeds." *Id.* at *4.

Here, too, the timing, the amounts, and the other pled facts create a strong inference that the approximately €37 million that Asperbras sent to BES Investimento on December 13 traces downstream to the €35.8 million that BES Investimento sent to Energy & Mining Asp just one business day later. Particularly under a civil preponderance standard, the Government has easily pled enough facts "to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f).

Finally, even if Ecree's tracing arguments were accepted, that still would not warrant dismissal of the FAC because it would not defeat the forfeiture claims based on ITSP. ITSP is based on the Sebrit contract, but the Sebrit contract was fraudulent even if the Diverted Funds did not derive from the Initial Transfer in Congolese funds.

## IV.    Conclusion

For the foregoing reasons, the Government respectfully requests that the Court deny

Ecree's motion to dismiss and allow the parties to conduct discovery.

Respectfully Submitted,

DAMIAN WILLIAMS
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK

BY: _____

Benjamin A. Gianforti
Assistant United States Attorneys
26 Federal Plaza
38th Floor
New York, NY 10278
Telephone: (212) 637-2490
benjamin.gianforti@usdoj.gov

MARGARET A. MOESER, CHIEF
MONEY LAUNDERING AND ASSET
RECOVERY SECTION (MLARS)

By:    /s/ *Joshua L. Sohn* _____
MARY BUTLER
Chief, MLARS-International Unit
JOSHUA L. SOHN (CA Bar No. 250105)
Trial Attorney, MLARS-IU
United States Department of Justice
1400 New York Avenue, NW
Bond Building, Suite 10100
Washington, DC 20005
Telephone:   (202) 353-2223
Facsimile:  (202) 616-2547
Email:        joshua.sohn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2024, I caused the foregoing document to be served, via CM/ECF, to all counsel of record in this action.

By: _____

Benjamin A. Gianforti