UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 24-cv-2420 (KPF) |
| - against - | *Related case*: No. 19-mc-195 (KPF) |
| REAL PROPERTY LOCATED AT 1 CENTRAL PARK WEST, UNIT 32G, NEW YORK, NEW YORK 10023, | |
| Defendant. | |

**CLAIMANT ECREE'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS THE AMENDED COMPLAINT**

PRYOR CASHMAN LLP
7 Times Square, Suite Level 40
New York, NY 10036
Tel: (212) 421-4100

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................................ 1

ARGUMENT ......................................................................................................................................... 1

    I.    The government fails to plead sufficiently detailed facts to support a reasonable belief that it will be able to prove the SUA based on foreign misappropriation at trial ........................................................................................... 1

        A.    *The foreign misappropriation SUA cannot be based on a transfer of private funds* ........................................................................................................ 2

        B.    *The government cannot resurrect the foreign misappropriation SUA by now speculating in its briefing that there may have been wrongdoing before the transfer of funds to Asperbras* ............................... 3

    II.    The Amended Complaint fails to allege an ITSP SUA ........................................ 6

        A.    *The Amended Complaint does not allege that the Sebrit–Energy & Mining Asp contract was fraudulent* ......................................................... 6

        B.    *The Amended Complaint does not allege scienter* ...................................... 7

    III.    The Amended Complaint fails to allege that the Funds used to purchase the Apartment are traceable to the Initial Transfer ............................................. 9

CONCLUSION ................................................................................................................................... 11

# TABLE OF AUTHORITIES

**PAGE(s)**

**CASES**

*Cappone v. Morrissey*,
  2018 WL 4055280 (E.D.N.Y. July 27, 2018), *report and recommendation adopted*, 2018 WL 4054871 (E.D.N.Y. Aug. 24, 2018)............................................................7

*Lefkowitz v. Reissman*,
  2014 WL 925410 (S.D.N.Y. Mar. 7, 2014) ...............................................................................7

*Uddoh v. United Healthcare*,
  254 F. Supp. 3d 424 (E.D.N.Y. 2017) ......................................................................................6

*United States v. Approx. 32133.63 Tether (USDT) Cryptocurrency*,
  2023 WL 5334352 (E.D. Wis. Aug. 18, 2023) .......................................................................10

*United States v. One Gulfstream G-V Jet Aircraft*,
  941 F. Supp. 2d 1 (D.D.C. 2013) ..............................................................................................5

*United States v. Osborne*,
  886 F.3d 604 (6th Cir. 2018) ................................................................................................2, 3

*United States v. Prevezon Holdings Ltd.*,
  122 F. Supp. 3d 57 (S.D.N.Y. 2015).........................................................................................4

**Statutes**

18 U.S.C. § 641............................................................................................................................2

18 U.S.C. § 1956(c)(7).............................................................................................................2, 5

**PRELIMINARY STATEMENT**

To prevail at trial, the government will be required to prove both that one of the crimes identified by Congress as an "SUA" occurred and that the funds used to purchase the Apartment are traceable to this SUA. The Amended Complaint must be dismissed under Supplemental Rule G(2)(f) unless the government alleges "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." The government failed to do so. There are two independently sufficient bases to dismiss the Amended Complaint under Rule G. *First*, the Amended Complaint does not allege sufficiently detailed facts to support a reasonable belief that the government will be able to prove the SUAs identified in the Amended Complaint. In the Amended Complaint, the government based both SUAs on foreign misappropriation of public funds of the Congolese government in violation of Congolese law. In its Opposition it suggests for the first time that it meant to plead that the ITSP SUA was based on a fraudulent contract. Even if the Court permitted this constructive amendment, neither the new theory nor the original theory meet the requirements of Rule G. *Second*, it does not allege sufficiently detailed facts to support a reasonable belief that the government will be able to prove that funds used to purchase the Apartment are traceable to an SUA.

**ARGUMENT**

**I.     The government fails to plead sufficiently detailed facts to support a reasonable belief that it will be able to prove the SUA based on foreign misappropriation at trial.**

The government fails to plead an SUA based on foreign misappropriation of public funds of the Congolese government because the Amended Complaint alleges that funds were unlawfully "diverted" only *after* these funds belonged to Asperbras as a result of the Initial Transfer. Because Asperbras is a private company, not a branch of the Congolese government, a transfer of funds from Asperbras cannot be a violation of 18 U.S.C. § 1956(c)(7), even if Asperbras decided to use

1

some of these funds to pay an entity indirectly owned by a person who was a public official (which the government speculates, but does not plead).

   A. *The foreign misappropriation SUA cannot be based on a transfer of private funds.*

The government offers the counterintuitive view that public funds do not stop being public funds even when they are paid to a private company. (Opposition to Ecree LLC's Motion to Dismiss, ECF No. 29 ("Opp.") at 8.) Under this theory, if funds Asperbras was paid by the Congolese government were stolen from Asperbras, this is a theft of Congolese government funds because they were still Congolese public funds even after being paid to Asperbras. But it is not the case that when a government transfers property to private hands, it remains government property. Social Security payments, Medicaid and Medicare payments, payments to defense contractors or veterans benefits payments do not remain government funds after they are received. Judges need not worry that their salary payments still belong to the government after the payments are deposited in their accounts.

Caselaw construing 18 U.S.C. § 641, the statute prohibiting theft of U.S. funds, makes this clear. Those cases acknowledge that "where [money] that originated with the federal government passes to private hands," they are no longer, as such, federal funds. *United States v. Osborne*, 886 F.3d 604, 608-09 (6th Cir. 2018) (citation omitted). The limited exception to this rule is when "the government retain[s] sufficient supervision and control over the funds" provided to a third party, under which circumstances they may "retain[] their federal character." *Id*. Setting aside the Amended Complaint's failure to even plead that the funds transferred in the Initial Transfer came from the Congolese government,[1] it has made no specific allegations from which the Court could

---

[1]  The government argues that the Amended Complaint alleges an "Initial Transfer from the Congolese Direction Générale du Trésor, a Congolese public agency" (Opp. at 7), but that is *not* what the Amended Complaint alleges. Instead, it only alleges that the wire accompanying the Initial Transfer had "instructions referencing 'DGT,' an apparent reference to the Congolese

2

reasonably infer that the Congolese government "retain[ed] sufficient supervision and control over the funds [it paid to Asperbras] such that the funds retained their . . . character" as public funds. *Id*. at 617-18.  To the contrary, the Amended Complaint alleges that the wire transfer to Asperbras was payment for the construction of hospitals.  (AC ¶ 14.)  The government has made no allegation from which the Court could reasonably infer that after the payment for the hospital construction the Congolese government had the ongoing ability to control the funds.  Accordingly, any SUA based on an unlawful taking of Congolese government funds must fail if that SUA is based on actions that occurred after Asperbras, a private company, received the Initial Transfer.

> B. *The government cannot resurrect the foreign misappropriation SUA by now speculating in its briefing that there may have been wrongdoing before the transfer of funds to Asperbras.*

Having based its foreign misappropriation SUA on the ownership interest of the Congolese government in funds paid to Asperbras, the government cannot save this SUA claim by arguing, or asking the Court to come up with an argument, that the transfer to Asperbras was itself an unlawful misappropriation of funds of the Congolese government.

The government relegates to a footnote the observation that "[p]erhaps a more artful drafting would have been to say that the Government is not alleging that the funds were 'entirely' procured through a violation of Congolese law or that the hospital invoice was a 'complete sham.'" (Opp. at 8, n.1.)  That is just another way of saying that the Amended Complaint does *not* allege these things.  The Amended Complaint does not allege that anyone in the Congolese government procured the hospital invoice or the Initial Transfer "so they could be used in part to purchase the Apartment for Sassou Nguesso, not to construct hospitals back home."  (*Id*. at 8, n.1.)  The government admits this.  (*Id*. at 11 (the Amended Complaint "does not contain an explicit

---

Direction Générale du Trésor."  (AC ¶ 14.)  This is not the same as alleging that the transferor *was* the Direction Générale du Trésor or that the wired funds were public Congolese funds.

3

allegation that Asperbras's invoice for the hospital construction project was inflated so as to mask a kickback to Sassou Nguesso").)[2]

The government's citation to *United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57 (S.D.N.Y. 2015) is quite enlightening, although not for the reason it thinks. (*Id*. at 8-9.) The forfeiture complaint in that action survived a motion to dismiss not because "public funds do not stop being public funds simply because they are passed through a private intermediary" (*Id*. at 8), but because that complaint contained the very thing that the Amended Complaint lacks: specific factual allegations about actions taken before the transfer of funds from the Russian government to a private entity that allowed that entity to misappropriate those funds *directly from the Russian government*. The Russian criminal organization, including public officials, obtained fraudulent court judgments, which it then used as the basis of fraudulent tax claims that induced the Russian government to send tax refunds. *See Prevezon*, 122 F. Supp. 3d at 62 ("tax officials—*also working for the Organization*—approved the refund requests"), *id*. at 73 ("members of the Organization *who were officials at two Russian tax offices* 'corruptly approved' the tax refund requests") (emphases added). In stark contrast to the allegations in *Prevezon*, the Amended Complaint does

---

[2] The Amended Complaint also does not allege that any Congolese official "arrange[d] for a portion of the money to be diverted once it was in the private contractors' hands." (Opp. at 10; *see also id*. at 11 (the Amended Complaint "does not allege explicitly that any Congolese public official was involved in the sham contract between Sebrit and Energy & Mining Asp").) In fact, the Amended Complaint never identifies which public Congolese official accomplished any purported "diversion" of funds after the Initial Transfer, perhaps hoping the Court will imagine what the government has carefully declined to allege. On this point, the government refers to its theory that "Sebrit was really just a front for Sassou Nguesso." (*Id*. at 11.) But alleging Claudia Sassou Nguesso's purported indirect ownership interest in Sebrit is not the same thing as alleging that she negotiated, or even knew about, the contract between Sebrit and Energy & Mining Asp, much less that she was involved in her capacity as a government official.

not allege any wrongdoing in the Initial Transfer, much less corrupt involvement by Congolese public officials.

The government makes a policy argument that, under Ecree's theory, in order to avoid Section 1956(c)(7)(B)(iv), all that foreign public officials "would need to do is simply contract with private companies for legitimate purposes, send large amounts of state funds to those private contractors, and then arrange for a portion of the money to be diverted once it was in the private contractors' hands." (Opp. at 10.) This hypothetical is irrelevant for two reasons. *First*, as explained above, that is not what the Amended Complaint alleges happened here. No Congolese public official is alleged to have made such an arrangement. *Second*, the fact that a public official pressuring a private contractor to use private funds as the official wishes is acting wrongfully does not mean this act is prohibited by Section 1956(c)(7)(B)(iv). There are a variety of statutes prohibiting such conduct, but Section 1956(c)(7)(B)(iv) is not one of them.

Finally, the government's attempt to distinguish *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1 (D.D.C. 2013) mischaracterizes the relevance of that case. (*Id*. at 11-12.) The government waves away that complaint as simply alleging "in general terms that members of the Equatorial Guinea elite engaged in corrupt schemes" (*Id*. at 12) without a trace of irony, even though that is exactly what it alleges took place here. It points instead to the Amended Complaint's allegations regarding "a specific contract—entered into by named parties on a specific day—and specific transactions pursuant to that contract were fraudulent and a means to divert Congolese funds for the benefit of a Congolese public official, Sassou Nguesso." (*Id*.) But even as to those purportedly "specific" allegations, just as the complaint in *One Gulfstream* failed to do, the Amended Complaint does not allege that this contract was illegal under any law, nor does it allege the illegal involvement of any Congolese public official in that contract.

5

These failures are not, as the government supposes, something that Ecree must "argue [] to the factfinder." (*Id*. at 11.) Under the heightened pleading requirements of Rule G, the Amended Complaint must plead "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Where, as here, it does not allege such specific facts, the government's case never gets to the factfinder. The Court should reject any attempt by the government to retrospectively redraft the Amended Complaint in its opposition or at oral argument, especially where Ecree identified this exact pleading failure in its MTD Letter, and the government explicitly declined to amend the Original Complaint to remedy it.

**II.     The Amended Complaint fails to allege an ITSP SUA.**

   *A.    The Amended Complaint does not allege that the Sebrit–Energy & Mining Asp contract was fraudulent.*

Apparently recognizing its failure to plead facts from which the Court could infer the misappropriation of Congolese government funds, the government now suggests for the first time that its ITSP claim is not based on a misappropriation of Congolese government funds. The ITSP statute requires the transmission of funds into the United States by someone who knows those funds were "stolen, converted or taken by fraud." The government now asserts that its ITSP theory is solely "based on the Sebrit contract" with Energy & Mining Asp and that Sebrit engaged in fraud when it "contracted to perform vague geophysical services in exchange for the Diverted Funds, but actually performed no such services and instead used the Diverted Funds for the personal enrichment of Sassou Nguesso." (*Id*. at 14, 17.)

The Amended Complaint never characterizes this contract as fraudulent (nor did the government make this contention in its MTD Letter), and the Court should reject this theory because a plaintiff "is not permitted to interpose new factual allegations or a new legal theory in opposing a motion to dismiss." *Uddoh v. United Healthcare*, 254 F. Supp. 3d 424, 429 (E.D.N.Y.

2017).  Even if the Court considers it, the Amended Complaint contain no allegations concerning any misrepresentations made regarding this contract that would constitute fraud.  The government's theory that the contract was fraudulent instead boils down to its allegation that "upon information and belief, Sebrit did not provide significant services under the contract."  (AC ¶ 17.)  The government's speculation about unspecified inadequate contractual performance is insufficient.  Under Rule G, it is not enough for the government to copy allegations from a private report about the existence of a contract and whether it was performed and tack on the phrase "on information and belief."  Such conclusory allegations fail to comply with Rule G in the absence of specific factual allegations about the purportedly required services, how they were required under the contract, which services were and were not performed, and facts suggesting they were not performed.  The Amended Complaint does none of this.

Moreover, even if the Amended Complaint had plausibly alleged facts from which the Court could infer that the government will be able to prove that the contract was not adequately performed, which it did not, that would be a contractual breach, not a fraud.  *See, e.g.*, *Cappone v. Morrissey*, 2018 WL 4055280, at *7 (E.D.N.Y. July 27, 2018), *report and recommendation adopted*, 2018 WL 4054871 (E.D.N.Y. Aug. 24, 2018) ("where a plaintiff alleges that defendants' failure to honor a promise (*i.e.* contract nonperformance) is the basis of the alleged fraud, the plaintiff 'must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim'") (quoting *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016)); *Lefkowitz v. Reissman*,  2014 WL 925410, at *6 (S.D.N.Y. Mar. 7, 2014) (noting that a simple breach of contract is "not included in the definition of 'specified unlawful activity'").

7

Not only does the government fail to allege specific facts suggesting that Sebrit was defrauding Energy & Mining Asp or Asperbras, it admits that it is possible the opposite is true, stating that "[i]f Energy & Mining Asp (and the Asperbras entities writ large) knew of the scheme, then Sebrit and the Asperbras entities defrauded the Congo." (Opp. at 15.) But this alternative theory also fails because the Amended Complaint does not allege the existence of criminal scheme, plead specific facts from which the Court could infer that the government can prove at trial the existence of such a scheme, or plead knowledge by "the Asperbras entities writ large" of much of anything, much less that any of them had knowledge of any "scheme." As a result, the Amended Complaint does not state a claim for the international transportation of fraudulently obtained property based on the Sebrit contract.

  B.  *The Amended Complaint does not allege scienter.*

The government's attempt to gin up allegations that Mr. "Veiga and Sassou Nguesso acted with the requisite scienter" for the ITSP claim also fails. (*Id*. at 13.) The government recites Mr. Veiga and Claudia Sassou Nguesso's involvement "in every step of the pled conduct," but omits the step that is critical for its case: knowledge that the $7.1 million transmitted into the United States was "fraudulently-obtained." (*Id*.) There is no factual basis for inferring that either Mr. Veiga or Claudia Sassou Nguesso knew that the Sebrit contract would not be performed, particularly since the government has not even alleged facts from which the Court can *now* infer the contract was not performed. Much less is there reason to infer knowledge that such non-performance would be a fraud on Energy & Mining Asp. The government has not yet decided whether it thinks there was a fraud on Energy & Mining Asp, much less alleged specific facts suggesting Mr. Veiga or Claudia Sassou Nguesso knew this at the time. And even if the Sebrit contract somehow worked a fraud on the Congo rather than Energy & Mining Asp (which was not alleged), the Amended Complaint contains no allegations that Mr. Veiga or Claudia Sassou

8

Nguesso were even aware of the circumstances by which Energy & Mining Asp obtained the funds it used to pay Sebrit, much less that they were involved in its obtaining the funds.

The government's recitation of Mr. Veiga and Claudia Sassou Nguesso's supposed involvement with the creation of Sebrit and the following alleged conduct (*Id*. at 12-13), consequently, does not rescue the ITSP claim, and therefore does not matter. But it is worth noting that, here again, the government misrepresents the allegations in the Amended Complaint that it had the opportunity to amend but chose not to. *First*, the Amended Complaint does not, in fact, allege that Mr. "Veiga set up Sebrit as a shell company to benefit Sassou Nguesso" (*Id*. at 12) because it does not allege anything about Sebrit's incorporation other than that it happened. Pursuant to a vaguely described "pair of contracts," Claudia Sassou Nguesso was allegedly the owner of Voxxi, which owned Sebrit, but the Amended Complaint does not allege that Mr. Veiga knew that, much less that he incorporated Sebrit at her direction or for her benefit. (*Id*. at 13.) Indeed, those purported contracts were executed months before Sebrit's incorporation (AC ¶ 15), and the government itself characterizes Voxxi as being "secretly" owned by Claudia Sassou Nguesso (Opp. at 12 (emphasis added)). *Second*, the Amended Complaint does not, in fact, allege that Ecree's "beneficial ownership also rolled up to Sassou Nguesso" (*id*), because the Amended Complaint contains no allegations whatsoever about the ownership, beneficial or otherwise, of Ecree (*cf. id*. at 13 (citing Ecree's Verified Claim, not the AC)).

**III.  The Amended Complaint fails to allege that the Funds used to purchase the Apartment are traceable to the Initial Transfer.**

The Amended Complaint's allegations regarding the flow of funds following the Initial Transfer falters at paragraph 18. There, it alleges that "Asperbras sent approximately €37 million to BES Investimento on December 13 and BES Investimento sent approximately €35.8 million to Energy & Mining Asp the next business day." (*Id*. at 16 (citing AC ¶ 18).) But BES Investimento

was the financial institution, not the accountholder. The Amended Complaint does not allege that the EUR 37 and 35.8 million transfers went into or out of the same BES Investimento account, or identify who either of the accountholders were. Instead, it simply relies on the fact that they were accountholders at the same bank and hopes that the Court will join it in speculating that the accountholders were identical or were acting pursuant to some unspecified agreement that allows transfers into the first account to be traced to transfers out of another account. This is not good enough. In fact, the only other allegation in the Amended Complaint the government relies on— "that the Asperbras entities routinely used BES Investimento as an intermediary institution to route funds" (*Id*. at 16)—*undercuts* the inference. The more transfers that Asperbras sent into and out of BES Investimento, the less likely it is that any pair of transfers consisted of the same funds. The government assured the Court at the June 12 conference that "part of the reason why it took so many years [for the government to file the Original Complaint] is because of all of the tire-kicking that we were doing through warrants, mutual legal assistance treaty requests, grand jury subpoenas, etc." (ECF No. 24-1 at 24:6-10.) Apparently, the result of that tire-kicking is to ask the Court to just assume these accountholders are the same. This does not comply with Rule G, which has "more stringent than the general pleading requirements," for the specific purpose of preventing the government from abusing the "drastic nature of the civil forfeiture remedy." (MTD at 9-10.)[3]

---

[3] The government's reliance on *United States v. Approx. 32133.63 Tether (USDT) Cryptocurrency,* 2023 WL 5334352 (E.D. Wis. Aug. 18, 2023) is misplaced. The facts of that case bear no resemblance to the tracing flaw in the Amended Complaint, and shed no light on how the Court should assess the allegations here. Indeed, the government does not even attempt to analogize the facts of that case, and instead, apparently, cites it for the proposition that the Amended Complaint should get a free pass simply because other "courts have accepted money traces that are far looser than the money trace alleged here." (Opp. at 16-17.)

10

## **CONCLUSION**

For the reasons stated above, the Court should grant Ecree's motion to dismiss the Amended Complaint.

Dated: September 6, 2024

Respectfully submitted,

PRYOR CASHMAN LLP

By: */s/ Jeffrey Alberts*

Jeffrey Alberts
Aaron Wiltse
7 Times Square, Suite Level 40
New York, NY 10036
Tel: 212-326-0800
Email: jalberts@pryorcashman.com
Email: awiltse@pryorcashman.com

*Counsel for Claimant Ecree LLC*